TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
JOSHUA O. MAUSNER (Cal. Bar No. 260251)
Assistant United States Attorneys
National Security Division
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0619
     E-mail:    joshua.mausner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 23-00576-FLA |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT OLOF KYROS GUSTAFSSON |
| v. | |
| OLOF KYROS GUSTAFSSON, aka "Sir Olof Gustafsson," aka "El Silencio," | |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorney Joshua O. Mausner, hereby files its Sentencing Position Regarding Defendant Olof Kyros Gustafsson ("defendant").

///

///

///

The government's Sentencing Position is based on the United States Probation Office's Presentence Report ("PSR"), the record of the proceedings in this case, and any further evidence and argument that the Court may permit.

Dated: January 20, 2026                    Respectfully submitted,

                                           TODD BLANCHE
                                           Deputy Attorney General

                                           BILAL A. ESSAYLI
                                           First Assistant United States
                                           Attorney

                                           IAN V. YANNIELLO
                                           Assistant United States Attorney
                                           Chief, National Security Division


                                             /s/
                                           JOSHUA O. MAUSNER
                                           Assistant United States Attorney

                                           Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.     INTRODUCTION**

On July 18, 2025, defendant Olof Kyros Gustafsson ("defendant") pleaded guilty to Counts One, Two, Eleven, Fourteen, Fifteen, and Fifty-Six of the Indictment, alleging Conspiracy to Commit Wire Fraud and Mail Fraud, in violation of 18 U.S.C. § 1349; Wire Fraud, in violation of 18 U.S.C. § 1343; Mail Fraud, in violation of 18 U.S.C. § 1341; Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h); Concealment Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and International Concealment Money Laundering, in violation of 18 U.S.C. § 1957(a)(2)(B)(i), respectively.  (Dkt. 29.)  Defendant's guilty pleas were made pursuant to a Plea Agreement, filed by the parties on July 11, 2025 (the "Plea Agreement).  (Dkt. 25).

On October 31, 2025, the United States Probation Office ("USPO") disclosed defendant's Presentence Investigation Report ("PSR"). (Dkt. 35.)  According to the USPO, defendant's total offense level is 24 and his criminal history category is I, which results in an advisory Guidelines range of 51 to 63 months.  (PSR at 4.)[1]  Because the parties did not agree to it, and to the extent required by its obligations under the Plea Agreement, the government objects to the two-level enhancement for "sophisticated laundering" pursuant to U.S.S.G. § 2S1.1(b)(3).  The government agrees with the other components of the PSR's calculations.

---

[1] Paragraph 121 of the PSR appears to mistakenly state that defendant's offense level is 20 and Guidelines range is 33-41 months. The government believes this simply to be a clerical or typographical error in this paragraph of the PSR.

Consistent with the Plea Agreement, assuming defendant has satisfied the conditions agreed to within the Plea Agreement (as discussed in greater detail below) prior to the sentencing hearing, the government will recommend a custodial sentence of 33 months consistent with the Plea Agreement.

## II.  STATEMENT OF FACTS

As set forth in the Plea Agreement and PSR, defendant operated a fraud scheme whereby he marketed and accepted payments from customers for a series of products that did not exist.  After receiving payments from customers for these purported products, defendant laundered the fraud proceeds through a series of bank accounts located in the United States and abroad.

As defendant admitted in his Plea Agreement (see Plea Agreement ¶ 19), the relevant facts are as follows:

Escobar, Inc. was a corporation registered in the Commonwealth of Puerto Rico.  Escobar, Inc. held successor in interest rights to the persona and legacy of Pablo Escobar, the deceased Colombian narcoterrorist and head of the Medellin Cartel.  Escobar, Inc. used the likeness and persona of Pablo Escobar to market and sell purported consumer products to the public.  Defendant was the Chief Executive Officer of Escobar, Inc.

Wire and Mail Fraud Conspiracy and Scheme

Beginning on a date unknown, but no later than in or around July 2019, and continuing through on or about November 21, 2023, in Los Angeles, Orange, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, including the countries of Sweden, the United Arab Emirates, Estonia, and Spain, defendant conspired with others, and devised and executed a scheme,

2

to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and mail fraud, in violation of Title 18, United States Code, Section 1341.

As part of the conspiracy and scheme to commit wire and mail fraud, defendant and his co-conspirators would identify existing products in the marketplace that were being manufactured and sold to the public.  Defendant would then use the Escobar persona to market and advertise similar and competing products purportedly being sold by Escobar, Inc., including advertising the competing Escobar, Inc. products at a price substantially lower than the existing products, targeting victims residing in the Central District of California as well as throughout the United States and the world.

Defendant and his co-conspirators would communicate with purported Escobar, Inc. customers, located in the Central District of California and elsewhere, including by using email in interstate and foreign commerce, and would receive payments from customers for purported Escobar, Inc. products, including payments through payment processors such as PayPal, Klarna, CC Bill, Stripe, Coinbase, and Coinpayments, among others, as well as through mailed and deposited checks and direct bank wire transfers made by customers, including through Fedwire, Swift, and other transfers in interstate and foreign commerce.  These payments from purported customers were made to various accounts owned and operated by defendant and his co-conspirators, both in the United States and abroad.

In actuality, however, despite receiving payments from customers who intended to purchase Escobar, Inc. products, defendant and his co-conspirators did not deliver the Escobar, Inc. products to paying customers, as those products did not exist.

Defendant and his co-conspirators would then transfer and launder the funds paid by customers through various bank accounts, including accounts in the Central District of California and elsewhere in the United States and abroad, ultimately to accounts owned by defendant, his family members, and others, who would then use the funds for their own personal use.

Examples of purported Escobar, Inc. products that were marketed and sold, but were not delivered to customers, included the following:

Escobar Flamethrower

In or around July 2019, defendant began advertising the Escobar Flamethrower for sale to customers.  The Escobar Flamethrower was modeled after the "Not a Flamethrower" marketed and sold by The Boring Company for $500.  Defendant and his co-conspirators marketed the purported Escobar Flamethrower for sale for $249.  Defendant and his co-conspirators sold and accepted payment from customers for the Escobar Flamethrower, but the Escobar Flamethrowers were not delivered to paying customers.

Escobar Fold Phone

In or around December 2019, defendant began advertising the Escobar Fold Phone for sale to customers.  The Escobar Fold Phone was marketed as being designed in the United States, manufactured in Hong Kong, and available for sale for $349 via the Escobar, Inc. website. Defendant and his co-conspirators accepted payment from customers for the Escobar Fold Phone, but the phones were not delivered to paying customers.

Escobar Fold 2 Phone

In or around February 2020, defendant began advertising the "upgraded" Escobar Fold 2 Phone for sale to customers.  The Escobar Fold 2 Phone was marketed as a competitor to the Samsung Galaxy Fold phone, and was available for sale for $400 via the Escobar, Inc. website.  Defendant and his co-conspirators sold and accepted payment from customers for the Escobar Fold 2 Phone, but phones were not delivered to paying customers.

Escobar Gold 11 Pro Phone

In or around May 2020, defendant began advertising the Escobar Gold 11 Pro Phone.  The Escobar Gold 11 Pro Phone was marketed as a refurbished Apple iPhone 11 Pro, plated in 24 karat gold, available for sale for $500 via the Escobar, Inc. website.  Defendant and his co-conspirators sold and accepted payment from customers for the Escobar Gold 11 Pro Phone, but phones were not delivered to paying customers.

Escobar Cash

In or around December 2021, defendant began advertising Escobar Cash, which was marketed as the world's first "physical cryptocurrency," which was available for sale in several denominations at a U.S. dollar conversion rate of 1/1000th of U.S. dollar face value.  Defendant and his co-conspirators sold and accepted payment from customers for Escobar Cash, but did not deliver the product to all paying customers.

In furtherance of the scheme, and to further defraud customers, defendant and his co-conspirators would send crudely-made samples of purported Escobar, Inc. products to online technology reviewers and social media influencers in order to attempt to increase demand among

the public for the purported Escobar, Inc. products.  For example, defendant sent Samsung Galaxy Fold Phones wrapped in gold foil and disguised as Escobar, Inc. phones to online technology reviewers to attempt to induce victims who watch the online reviews into paying for and purchasing the non-existent Escobar, Inc. products.

Also in furtherance of the scheme, rather than sending customers the products for which they paid, defendant and his co-conspirators would mail to customers a "Certificate of Ownership," or a book or other promotional materials for Escobar, Inc., so that there was record of a mailing from Escobar, Inc. to the customer.  When a paying customer would attempt to obtain a refund when the product was never delivered, defendant and his co-conspirators would fraudulently refer a payment processor to the proof of mailing for the Certificate of Ownership or other mailed promotional materials as proof that the product itself was shipped and received by the customer, such that the refund requests would be denied.  While some refunds were completed by payment processors, the vast majority were not due defendant's fraudulent representations.

Defendant and his co-conspirators operated the Escobar, Inc. scheme from outside the United States, and victimized hundreds of purported customers both inside the United States and abroad using interstate wires and mailings, including a July 11, 2019 wire payment through PayPal of $249 from victim D.R. from the Central District of California to an Escobar, Inc. PayPal account, as well as a July 13, 2019 mailing of a "Certificate of Ownership" to victim D.R. within the Central District of California.  The total intended loss amount for the conspiracy and schemes to defraud was at least $1,300,193.41.

6

<u>Money Laundering Conspiracy and Scheme</u>

In addition to wire and mail fraud, defendant also conspired and engaged in money laundering to transfer and conceal the proceeds of the fraud schemes.

Beginning on a date unknown, but no later than in or around July 2019, and continuing through on or about November 21, 2023, in Los Angeles, Orange, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, including the countries of Sweden, the United Arab Emirates, and Spain, defendant conspired with others to knowingly and intentionally commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i), and 1957.

As part of the money laundering conspiracy, defendant and his co-conspirators would cause bank accounts to be opened under their own names and names of entities they controlled to be used as funnel accounts, that is, bank accounts into which they would deposit and withdraw proceeds derived from wire fraud and mail fraud, so as to conceal and disguise the nature, location, source, ownership, and control of the proceeds.

Defendant and his co-conspirators would then transfer, deposit, or cause victims to deposit proceeds derived from the fraud schemes into the funnel accounts, and then withdraw or transfer the fraudulently obtained funds from the funnel accounts, including through cash withdrawals, check cashing, writing checks, or transferring funds into further accounts under their control, in the United States and elsewhere around the world, including in Sweden and the United Arab Emirates, and ultimately making payments to themselves and family members for their own personal use.

Transactions in furtherance of the money laundering conspiracy included, but was not limited to: (1) a $10,000 wire transfer on October 11, 2019 from a J.P. Morgan Chase Bank account ending in 4484 to a Wells Fargo Bank account ending in 8975, (2) a $9,950 wire transfer on October 11, 2019 from the Wells Fargo Bank account ending in 8975 to an Abu Dhabi Islamic Bank account ending in 2788 in the United Arab Emirates, and (3) a $20,295 wire transfer on December 17, 2019 from a Nordea Bank account ending in 3922 in Sweden to the Wells Fargo Bank account ending in 8975.

**III.  THE PLEA AGREEMENT**

**A.    Offense Level Computation**

Pursuant to the Plea Agreement, the parties agreed to the following offense level computation (Plea Agreement ¶ 21):

| | | |
|---|---|---|
| Base Offense Level: | 7 | [USSG § 2B1.1(a)(1)] |
| Loss > $550,000 | +14 | [USSG § 2B1.1(b)(1)(I)] |
| 10 or More Victims | +2 | [USSG § 2B1.1(b)(2)(A)(i)] |
| Scheme Outside U.S. | +2 | [USSG § 2B1.1(b)(10)] |
| § 1956 Conviction | +2 | [USSG § 2S1.1(b)(2)(B)] |
| Zero-Point Offender | -2 | [USSG § 4C1.1] |

**B.    Conditions and Government's Recommended Sentence**

Pursuant to the Plea Agreement, and in consideration of a sentencing recommendation from the government, defendant agreed to a series of conditions, a number of which are to be completed prior to sentencing (Id. ¶¶ 2-4).  These conditions include that defendant complete the following:

a.    "At or before the time of sentencing, make a prejudgment payment by delivering a certified check or money order to

8

the Fiscal Clerk in the amount of $25,000 to be applied to satisfy defendant's anticipated criminal debt."  (Id. ¶ 2(h).)

b.   "To forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived from or acquired as a result of, used to facilitate the commission of, or involved in the illegal activity to which defendant is pleading guilty, specifically including, but not limited to . . . $396,956 on deposit in Klarna Bank, A.B. account number K688028 . . ."  (Id. ¶ 3(a)(i).)  Defendant further agreed to "take whatever steps are necessary to pass to the United States clear title to the Forfeitable Property, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States."  (Id. ¶ 3(c).)

c.   "Fully waive and agree to final and permanent revocation of his Lawful Permanent Resident status, or any other immigration status in the United States, including taking any necessary affirmative steps for full and permanent revocation of his legal status to be present in the United States."  (Id. ¶ 4(a).)

d.   "Defendant acknowledges that he is currently subject to a criminal investigation and forthcoming arrest warrant from France for alleged criminal conduct that is separate and unrelated to the conduct for which defendant is pleading guilty in the above-captioned matter.  In the event France requests the United States to extradite defendant for prosecution on said alleged conduct in compliance with the terms of the U.S.-France Extradition Treaty, defendant agrees to fully waive and agree to extradition to France in response to such a request."  (Id. ¶ 4(b).)

Assuming full compliance with the obligations and conditions of the Plea Agreement, the government agreed to recommend a sentence of imprisonment of no higher than 33 months: "At the time of sentencing, provided that defendant has complied fully and completely with the obligations and conditions imposed in paragraphs 2-4 [of the Plea Agreement], the government will recommend that defendant be sentenced to a term of imprisonment no higher than 33 months.  The parties also agree that the government may respond to a request by defendant for a sentence below the government's recommendation."  (Id. ¶ 5(e).)

### C.    Restitution

Pursuant to the Plea Agreement, defendant agreed to payment of restitution to victims in an amount of approximately $1,300,193.41, recognizing that this amount could change based on facts that come to the attention of the parties prior to sentencing.  (Id. ¶¶ 15, 26.)

### D.    Waivers of Appeal of Sentence and Waiver of Collateral Attack

In addition to waiving his constitutional rights by pleading guilty, by virtue of the Plea Agreement, defendant agreed to waive his right to appeal the sentence as follows:

Defendant agrees that, provided the Court imposes a term of imprisonment within or below the range corresponding to an offense level of 22 (after reductions for acceptance of responsibility) and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, provided it requires payment of no more than $1,300,193.41; (f) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set

10

forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

(Id. ¶ 26.)  Defendant also waived any right to bring a post-conviction collateral attack on the convictions or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.  (Id. ¶ 27.)

**IV.   PSR GUIDELINES CALCULATIONS[2]**

The USPO calculated defendant's base offense level at 7, consistent with the Plea Agreement.  (PSR ¶¶ 44-47.)  The following upward adjustments were added: a 14-level upward adjustment for loss amount (Id. ¶¶ 48-49); a two-level upward adjustment for number of victims (Id. ¶¶ 51-52); a two-level upward adjustment for commission of the crime from outside the United States (Id. ¶¶ 53-55); and a two-level upward adjustment for conviction under 18 U.S.C. § 1956 (Id. ¶¶ 56-57), all consistent with the Plea Agreement.

The USPO added an additional two-level upward adjustment for use of "sophisticated laundering" pursuant to U.S.S.G. § 2B1.1(b)(3). (Id. ¶¶ 58-60.)  To the extent required by its obligations under the Plea Agreement, because this enhancement was not agreed to by the parties in the offense calculation in the Plea Agreement, the government objects to this enhancement.

---

[2]    See PSR ¶¶ 40-70.

11

The USPO applied a two-level reduction for acceptance of responsibility (Id. ¶ 66); an additional one-level reduction for acceptance (Id. ¶ 67); and a two-level further reduction under the zero-point offender provision at U.S.S.G. § 4C1.1 (Id. ¶¶ 68-69). The government does not object and agrees with these reductions by the USPO.

Accordingly, the government calculates the total offense level at 22 and the resulting Guidelines range at 41 to 51 months.

**V.    STATUS OF THE CONDITIONS IN THE PLEA AGREEMENT**

As of the filing of this Sentencing Position, the government believes the status of the conditions defendant agreed to in the Plea Agreement and discussed above to be as follows:[3]

Prejudgment payment: Counsel for defendant has represented to government counsel that defendant intends to make the prejudgment payment of $25,000 prior to the sentencing hearing, as required by the Plea Agreement.[4]

Forfeiture of funds: It is the government's understanding that Klarna Bank has frozen the funds in defendant's Swedish Klarna Bank account number K688028.  Because Klarna Bank is still in possession of the funds, the government has submitted a Mutual Legal Assistance

---

[3] In the event the status of these conditions changes prior to the sentencing hearing, the government reserves the right to supplement or amend its sentencing position, to further update the Court through future pleadings or at the sentencing hearing, or, if necessary, to request a continuance of the sentencing to allow additional time for completion of the conditions.

[4] Paragraph 117 of the PSR appears to conclude "it does not appear that [defendant] has the present ability to make an immediate payment toward a financial obligation."  The government objects to this assertion.  Based on the assets that are noted in the PSR, the bank accounts defendant controlled, and defendant's own representations of his ability to pay a prejudgment payment as well as restitution, it appears defendant does, in fact, have the ability to make payments toward his financial obligations.

Treaty ("MLAT") request to the Kingdom of Sweden (where Klarna Bank's headquarters are located) related to forfeiture of the $396,956 in the account.  Satisfaction of the MLAT, and the government's forfeiture of the funds from defendant's Swedish bank account, are therefore not yet complete.  Pursuant to the Plea Agreement, defendant is obligated and has agreed to "take whatever steps are necessary to pass to the United States clear title to the Forfeitable Property, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States."  (Plea Agreement ¶ 3(c).)  At this time, it is unclear whether any additional actions are required by defendant for completion of the government's forfeiture of the Klarna funds.

Revocation of Lawful Permanent Resident status: Counsel for defendant has represented to government counsel that defendant will execute and submit a Department of Homeland Security USCIS Form I-407 "Record of Abandonment of Lawful Permanent Resident Status" memorializing that defendant is formally and permanently abandoning his Lawful Permanent Resident status, consistent with the Plea Agreement.[5]

Extradition to France: Government counsel has consulted with the Department of Justice's Office of International Affairs ("OIA") regarding communications with French authorities related their investigation of defendant for additional crimes separate from those

---

[5] The government also requests that the Court conduct a colloquy with defendant at sentencing confirming in open court that defendant is formally and permanently relinquishing any legal status in the United States, and that the Court's judgment and commitment reflect that defendant has formally and permanently abandoned any legal status to be present in the United States.

13

to which defendant has pled guilty in this matter.  It is government counsel's understanding that the French intend to request defendant's extradition to France, but a formal extradition request has not yet been submitted to the United States.  Once submitted, defendant is obligated and has agreed to fully waive and agree to extradition to France in response to such a request.  (Id. ¶ 4(d).)

**VI.   SENTENCING RECOMMENDATION**

In formulating a sentence that is "sufficient, but not greater than necessary" to comply with the goals of the Sentencing Reform Act, district courts "must treat the Guidelines as the starting point and the initial benchmark."  United States v. Henderson, 649 F.3d 955, 959 (9th Cir. 2011) (quoting Kimbrough v. United States, 552 U.S. 85, 108 (2007) (internal citations and quotation marks omitted)).  And, "in the ordinary case, the [United States Sentencing] Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  Id. (internal citations and quotation marks omitted).

In this case, a balancing of the section 3553(a) factors favors a custodial sentence of 33 months, assuming completion of the conditions in the Plea Agreement at the time of sentencing.  A sentence of 33 months' imprisonment reflects the seriousness of the offense conduct and also takes into account defendant's acceptance of responsibility, agreement to payment of restitution including a prejudgment payment, agreement to waive extradition to France, and agreement to formally and permanently abandon any legal status in the United States.  Accordingly, assuming compliance with the conditions in the Plea Agreement by the time of sentencing, the government

believes a sentence of 33 months' custody, representing a slight downward variance, to be a fair and appropriate sentence given the facts and circumstances presented in this case.

**VII.  RESTITUTION**

The government has provided to the USPO a confidential list of currently-known victims, including victim contact information and the amount of restitution owed each victim.  The government requests that the Court incorporate the confidential victim list in its judgment and commitment order, and order that restitution be paid in accordance with the confidential victim list.

**VIII.      CONCLUSION**

For the reasons stated above, assuming full compliance and satisfaction of the conditions in the Plea Agreement at the time of sentencing, the government intends to recommend a sentence of 33 months' imprisonment.